HOMER O. PRICE, Administrator of the Estate of FRANKLIN H. PRICE, Deceased, Appellant, v. LAWRENCE R. SCHNITKER, Respondent, No. 41858—239 S. W. (2d) 296.

Division Two, April 24, 1951.

Motion for Rehearing or to Transfer to Banc Overruled, May 14, 1951.

*John J. Robison, Harold L. Miller, Cross & Cross* and *Harry Hall* for appellant.

*Culver, Phillip, Kaufmann & Smith, Francis Smith, B. L. Kaufmann* and *Robert Frost* for respondent.

[297] LEEDY, J.—Action by Homer O. Price, as administrator of the estate of his son, Franklin, under the compensatory sections of the death statute (§§ 537.080, 537.090, RSMo 1949), to recover $15,000 damages for the alleged wrongful death of his decedent on August 24, 1947. Trial to a jury in the Circuit Court of Clinton County on change of venue from DeKalb County; verdict and judgment in favor of defendant, and plaintiff appeals. We will continue to refer to the parties as they were styled in the trial court.

The points relied on for reversal are in relation to the examination of plaintiff's witness, William Rast; the giving of certain instructions; and the argument of defendant's counsel. On the other hand, defendant contends these questions are of no consequence because, in any event, plaintiff's claim was barred by limitations, and his plea to that effect should have been sustained; and further that no submissible case was made because the evidence shows that no pecuniary loss was sustained by deceased's heirs at law.

The claim of the bar of limitations arises from defendant's assertion that the original petition (filed July 22, 1948) wholly failed to allege any pecuniary loss or actual damage had been suffered by the named beneficiaries (father, mother and sister) on whose behalf the administrator sued; and that such allegations first came into the case by an amendment made April 4, 1949, some 19 months after the cause of action accrued. It may be conceded that in the absence of such an allegation, the original petition would have failed to state a claim upon which relief could be granted. Defendant's whole claim in this connection is based upon the effect of the amendment of April 4, 1949, and overlooks this allegation of the original petition, contained in paragraph IX immediately preceding the prayer: "Plaintiff

states that the said beneficiaries were damaged in the sum of Fifteen Thousand Dollars ($15,000) by the death of the deceased.'' We hold that, as against the claim now urged, such general allegation gave the petition sufficient validity to permit of the amendment. For analogous situations, see Wente v. Shaver, 350 Mo. 1143, 169 S. W. 2d 947, 145 A. L. R. 1176, and cases therein cited. Defendant concedes that, as amended, the petition states a cause of action, so the point that the court should not have permitted the introduction of evidence touching actual or pecuniary damages need not be noticed.

We turn to the evidence touching pecuniary loss to determine defendant's claim that the evidence was insufficient in that respect to make a submissible case. Franklin Price was single and unmarried. He lived with his parents on a 259 acre farm, the title to which was held by the father, mother and son. Under their plan of operation each ''had a third apiece'' in the farm and the income therefrom. After Franklin's return from military service in 1945, he ''raised the crops,'' while the father merely ''chored around''. The son had no income other than that derived from the family arrangement above mentioned. While in the service he contributed out of his pay $35.00 per month to the family. After his return, he bought a cook stove, paid half the cost of a motor for the ''pick-up'' [truck], and his father's hospital bill of $55.00. He wired the house, bought a light plant and installed it. He spent $125.00 for a clover huller, and bought a new set of harness, and paid $300.00 or $400.00 a year for groceries. In the light of this showing, the contention that the evidence shows that no pecuniary loss was sustained must be overruled. Hertz v. McDowell, 358 Mo. 383, 214 S. W. 2d 546.

Franklin Price was about 30 years of age. He was instantly killed in an automobile collision on U. S. Highway 169 about 3 miles east of Union Star in Gentry County. The casualty occurred about 1:00 A. M., Sunday, August 24, 1947, at or near the crest of a hill. The highway at this place runs practically east and west from a T junction located about 1-1/2 miles to the east. Four motor vehicles were involved. One, a Chrysler in which Franklin was riding as a passenger, was eastbound; the others, all westbound, consisted of a Plymouth owned and driven by defendant Schnitker, [298] a jeep operated by one Barnes (who was originally joined as a defendant, but as to whom plaintiff dismissed at the close of the evidence), and a Chevrolet milk truck owned by American Dairies Company and operated by plaintiff's witness, Rast. The Chrysler was owned and being driven by Franklin's companion, Carl Marshall, who was also instantly killed. Marshall, Franklin, Barnes and Schnitker were residents of the locality. Rast, the truck driver, the only other eye witness, was a resident of Kansas City.

The serious point in the case is whether Rast's examination was so unduly restricted by the court as to constitute reversible

error. Reluctant as this court is to reverse upon grounds involving the exercise of a trial court's discretion, we feel constrained to do so in the situation here presented. There is no dispute as to the fact that just prior to the collision, as the milk truck proceeded westwardly, it was passed first by the Barnes jeep and then by Schnitker in his Plymouth, but as to the precise point with reference to the top of the hill, the evidence is conflicting as between the versions of Rast, on the one hand, and Barnes and Schnitker, on the other. Rast testified that as he was "pulling the grade," he observed "headlights coming over the top of the hill toward me" (which later proved to be the Chrysler, traveling east), and thereafter the jeep and then the Plymouth passed ("went around") him going west at about 60 miles per hour, and 15 or 20 feet apart, and that "the second car [defendant's Plymouth] cut me close and I pulled to the right and stopped as quick as I could stop." After the jeep passed him, "it took off of the road * * * to the right side, off toward the ditch". He testified that the Plymouth and the Chrysler sideswiped "pretty close" to the top of the hill, the Chrysler being on its own side of the road. This caused the Chrysler to veer toward the north or wrong side of the highway, and it "started sliding sideways—slid sideways right into the front end of the truck."

The limitation of the examination of this witness of which plaintiff principally complains is that he was not permitted to testify as to the course of the Plymouth after it passed the truck and before sideswiping the Chrysler. More specifically, plaintiff sought to show by Rast that the Plymouth had not returned to its own (or north) side of the highway at the time of the sideswiping, and this the court refused to permit. The court denied plaintiff's offer so to prove on the ground that the witness had already stated that "he was too busy looking after his own automobile to watch the course of the Plymouth." However, a careful examination of what had preceded fails to disclose this precise statement. The attempt to develop this particular proof was lengthy and interspersed with objections to such an extent that the record thereof is not wholly free from confusion. It is too lengthy to be reproduced in its entirety, but the following excerpts are sufficient to show the general tenor of the occurrence:

"Q. Now at the time of the sideswiping, where was the Plymouth with reference to the center line of the highway?

"A. Well, it's hard to say.

"Q. Did you observe the Plymouth from the time it passed you until the time it sideswiped the Chrysler?

"A. Yes and no, because I was busy stopping, and didn't pay too much attention to where it was for sure.

"Q. Tell the jury whether or not, as you observed it between the time the Plymouth passed you and the time it collided with the Chrysler, whether or not it ever returned north of the center line.

"A. I don't think it did get all the way back.

Mr. Smith: Just a minute; we object to that. He has answered before that he couldn't say.

The Court: Sustained.

"Q. What is your best recollection?

"A. I guess—

Mr. Kaufman (Interrupting): Your honor, I think counsel should be restrained. The witness has said—

The Court (Interrupting): The witness has said he was busy there looking after his own car. I sustained the objection. I can't have him guess at it when he said he was busy looking after his own car.

[299] Mr. Pross Cross: Well, find out if that is his best observation and recollection. Many people will use the word 'guess' when giving their best judgment.

The Court: No, I sustain the objection. He said he was busy looking at something else, too busy to pay much attention.

Mr. Pross Cross: I think the witness ought to have a chance to clarify that, and see what the witness means when he says guess or best judgment.

The Court: It isn't for that reason, Mr. Cross, that he used that word inadvisedly; but he said a few minutes ago that he was busy doing something with his own car and could not watch the Plymouth, so in view of that statement, I won't let him answer as to where it was.

\* \* \* \* \* \* \*

"Q. All right now, what direction were you looking from the time the Plymouth passed you until the time it collided with the Chrysler?

"A. Was looking ahead.

"Q. Did you observe the Plymouth during that period?

(Objection.)

The Court: Yes, I am not going to let this witness guess, after what he said, as to the location of the Plymouth car, when he said he was busy with his car, too busy to pay much attention.

\* \* \* \* \* \* \*

Mr. Hall: We don't want the witness to guess, but the witness was looking ahead, I want him to tell the jury what he saw.

(Objection and colloquy.)

The Court: Possibly a lot of this is getting out of the field of what is legitimate, or at least I think it is. You go ahead and ask whatever questions you want to Mr. Hall, but I am not going to let you rehabilitate the witness on that proposition. You go just as far as you want to, but you are not going to get it done.

1186

"Q. (By Mr. Hall) Mr. Rast, are you able to describe to this jury the direction that the Plymouth took from the time it passed you on that occasion until the time it collided with the Chrysler automobile, and what I mean—I mean your best recollection and no guess work?

Mr. Smith: I object to that question. The witness has already answered and counsel keeps repeating to get him to change.

\* \* \* \* \* \* \*

The Court: I have ruled on the same proposition at least one or two times, I sustain the objection.

Mr. Hall: Well, your honor, we object, and we offer to prove by this witness what he saw, and that he saw the path of the Plymouth from the time it passed and went around him until the time it collided or sideswiped with the Chrysler. And we further offer to show by this witness that the Plymouth never returned north of the center-line of the highway, but at all times continued on his wrong side of the highway.

The Court: And I say the witness, in answer to a question from the court, said he was too busy looking after his own automobile to watch the course of the Plymouth automobile, in the face of that, I sustain the objection and deny the offer."

It will be seen that the nearest approach to the statement attributed to the witness by the court (and upon the strength of which the ruling complained of was made) was his answer to whether he had observed the Plymouth from the time it passed him until it sideswiped the Chrysler, as follows: "*Yes and* no, because I was busy stopping, and didn't pay *too much* attention to where it was *for sure.*" A more equivocal utterance could hardly be imagined. Its effect was to say neither yes or no, but the learned trial judge apparently interpreted it as if the words we have italicized were omitted. This view also ignores the affirmative statement of the witness that from the time the Plymouth passed him until it collided with the Chrysler, he was looking ahead. We think neither the statement relied on nor any other having relevancy (as excerpted) constituted such a definite and conclusive admission or showing of want of knowledge touching the particular subject then under inquiry as to foreclose further development of it, and thus warrant the denial of the offer of proof. Schnitker testified that his car was north of the center line when the [300] collision occurred. The prejudicial effect of the denial of the offer is further emphasized by the fact that Rast was examined at great length respecting a signed statement given by him shortly after the accident to one of defendant's counsel, which was introduced in evidence. It appeared from this latter statement that he was sure that both the jeep and the Plymouth were on their own (or north) side of the center line when the cars sideswiped. Rast

vigorously denied having so stated in his interview, but defendant's counsel testified to the contrary. The view we have taken of the matter renders it unnecessary to consider other complaints touching the examination of the witness because the same are not likely to recur upon another trial. The same is true as to the objections preserved to the argument of defendant's counsel.

We have examined Instruction E, and find it not subject to the objection urged against it; that is, that it relieved defendant of the duty to keep as close to the right-hand side of the road as practicable. Such duty was expressly hypothesized. Witness this language: "If you find and believe from the evidence that at said time and place [as defendant "was approaching and meeting the automobile operated by Marshall," said the next preceding clause] the said Lawrence R. Schnitker was operating his said automobile as close to the right-hand side of said highway as was practicable," etc. Plaintiff's brief and argument make no reference to this language.

Nor do we find merit in the attack upon Instructions C and D as telling the jury "that the fact that the deceased was injured and instantly died was no evidence and in effect could not be considered by them in determining the question of the negligence of the respondent.". In neither instance does the language used sustain the charge. "D" told the jury nothing more than that it could not take into consideration or award any damages on account of the pain, anguish or bereavement which may have been suffered by the parents or surviving sister. And "C" instructed, among other things, that "the mere fact that Franklin H. Price received injuries in the accident referred to in the evidence causing his death is not enough *in and of itself* to justify a verdict."

Plaintiff complains of the repetitious nature as well as the number of cautionary instructions given at the request of defendant, and this with particular reference to the burden of proof. Ordinarily, of course, the giving of cautionary instructions is a matter within the discretion of the court. Instruction C, on the burden of proof, is in substantially the form given qualified approval in Montgomery v. Ross, (Mo.) 218 S. W. 2d 99, 104—"The instruction might have been in better form." However, it lacks the element suggested in Rouchene v. Gamble Const. Co., 338 Mo. 123, 135, 89 S. W. 2d 58, 63, that in defining preponderance of evidence, the jury be informed that what is meant thereby is evidence which is more convincing to them as worthy of belief than that which is offered in opposition thereto. In Mitchell v. Dyer, (Mo.) 57 S. W. 2d 1082, 1083, in commending the use of a short, simple instruction on the burden of proof, it was said that the "more the instruction is elaborated upon, the more complex it becomes and the more likely it is to be misunderstood." So it is with Instruction F (which, in effect, was an elaboration upon

1188

"'C'"), wherein the jury was told: "Neither are you permitted to base a verdict entirely and exclusively on mere surmise, guesswork and speculation, and if upon the whole evidence in the case, fairly considered, you are not able to make a finding that the defendant is liable without resorting to surmise, guesswork, speculation outside of and beyond the scope of the evidence and the reasonable inferences deductible therefrom, then it is your duty to and you must return a verdict for the defendant." Upon retrial, Instruction F should not be given, although we do not hold that the giving thereof upon the trial now under review constituted reversible error.

Because of the improper limitation upon the examination of the witness Rast, the judgment is reversed and the cause remanded. All concur.