## SMALL et al. v. WEGNER.

### No. 43394.

Supreme Court of Missouri.

Division No. 2.

April 12, 1954.

Louis E. Zuckerman, St. Louis, for plaintiffs-appellants.

Norris H. Allen and Anderson, Gilbert, Wolfort, Allen & Bierman, St. Louis, for defendant-respondent.

TIPTON, Presiding Judge.

This is a malpractice action brought by appellants, who are husband and wife, against respondent, who is a physician and who specializes in obstetrics and gynecology. The case was tried in the circuit court of St. Louis County. The jury

returned a verdict for the respondent and a judgment was entered accordingly. The appellants have duly appealed from that judgment.

Appellant Lillian Small became pregnant in July, 1949. In September or October of that year the respondent was engaged to look after her during her pregnancy. He examined her in his office the first time in October, and then on November 11th, November 29th and December 27th. Nothing unusual was found from these examinations except that on the last date she did complain of pains, especially in her abdomen and legs. On January 9, 1950, she discovered a vaginal discharge and the pains in the abdomen and legs greatly increased. The respondent was not available that day but on January 11th she telephoned him and told him she was having considerable bleeding. He advised her to rest and sleep. When he was told that she had sodium amytal in the house, he advised her to take it so she could sleep. She spent most of the time in bed on January 11th and 12th. She felt worse on the 13th and remained in bed that day except for the time when she went with her husband to his mother's home for dinner. She returned to her home about 6 P. M. of that day.

Appellant William D. Small testified that on the night of January 13th, between 12 and 12:30 o'clock, he called and told respondent that his wife was in extreme pain, and that respondent advised him to give her sodium amytal, that she would go to sleep and the pains would go away. This witness told respondent that he did not think that sort of medication would handle the situation as it was far beyond his own ability to cope with it; that she was in extreme pain; that she was screaming on the floor of the living room, begging for morphine, begging for a pistol to end her life, that she could not stand the pain; and that he asked respondent to come over to appellants' home. Respondent told this witness that it would not be necessary for him to come. When respondent asked this witness if his wife's

pains were intermittent, he told respondent he did not know because he could not get an accurate history, that his wife was beyond giving a history. He then told respondent that the patient was not hysterical and that she was in real pain, and again asked the respondent to see her, but respondent told the witness that he, the witness, could take care of her as well as respondent; and that he said she was probably having intra-uterine cramp. Witness testified he gave his wife sodium amytals as directed by respondent but they had no perceptible effect on her. Dr. Baker, who was a neighbor of appellants', came to their home, not as a physician, for ethical reasons, but for moral support. Witness' mother arrived at appellants' home about 2 A. M. of January 14th. About 2:30 A. M. of that date witness again called respondent and told him that his wife had given birth to a child or that she had had a miscarriage. He further testified that respondent told him there was no need of respondent's going to appellants' home because he could not perform the operation in a home and that she should be in a hospital. Mrs. Small was taken to the operating room at Barnes Hospital and respondent removed the placenta there. The baby died later.

Dr. William Nelson testified on behalf of appellants. He stated that he had given Mrs. Small psychiatric tests and that he had confidence in her ability to recover. He was asked a hypothetical question that embraced the facts brought out in appellants' evidence and was asked if the actions of respondent "demonstrated the degree of care and skill usually exercised by physicians treating pregnancy cases in the St. Louis area." In answer to the question he stated that, in his opinion, the patient had not had adequate care.

The respondent testified that on January 13th Mr. Small called by telephone and said his wife was uncomfortable and could not sleep, and that she was making frequent trips to the bathroom. Respondent asked about the character of discomfort and was told that the pains were not

intermittent. He specifically asked Small to ask his wife, "Are the pains, do they come and go, in other words, are they intermittent pains?" Appellant Small's answer was a definite "no." Respondent testified that physicians determine when a baby is about to be born by the character of the intermittent cramping that takes place in the uterus, and that from the information he received he was of the opinion that she was not in labor because of the definite statement that the pains were not intermittent. Respondent also testified that nobody told him that Mrs. Small was running around the house beating her head against the wall or yelling for a gun to kill herself. He was told she was in the bathroom and he told her husband to help get her back to bed and give her a capsule of sodium amytal. Respondent was again called by Mr. Small and informed that a baby had been born, and that Mr. Small's mother was there, also Dr. Baker. Respondent told him that it would be wise to bundle his wife and the baby in blankets and get them to the hospital as soon as possible, as the time element was the important thing for the baby. He delivered the afterbirth at the hospital and there was nothing abnormal about Mrs. Small's physical condition. He testified that when women begin to experience pains, they recognize very quickly intermittent pains. Sometimes these pains go on for several days, and sometimes they cease and start up again. Respondent testified that it is considered ordinary practice in the territory in and about St. Louis to wait until the intermittent pains come every ten minutes before the woman is sent to the hospital.

On cross-examination respondent testified that the Smalls had been told if the bleeding became more than a menstrual flow or if intermittent cramps began at any time respondent wanted to know immediately; that the criterion for determining whether a woman is in labor is for a physician to establish that the woman is having intermittent pains; that after talking to Mr. Small and hearing his denial of any intermittent pains, respondent felt safe to leave the patient at home; that if he had received a call and was told the woman was writhing with pain on the floor, that she was beating her head against the wall and was in severe pain, he would have gone right over; that he had encountered a case where a woman started to flow at five and one-half or six months and continued through normal pregnancy; and that a slight vaginal discharge always bears the significance of possible interruption of pregnancy. Respondent testified he did not say he would not go out to the home but did say that it was advisable to take Mrs. Small to the hospital. Respondent testified that he knew of no vaginal examination that would indicate that a woman was near the point of delivery of a baby. He further testified that "no examination prior to the onset of labor can determine the time of onset." He testified that progesterol is a hormone substance that is given by recognized obstetricians in an attempt to prevent a miscarriage, but he did not prescribe it for Mrs. Small as "rest, pain treatment and sedation were the most important things."

Dr. Frank P. McNally, a witness for respondent, testified that he graduated from the medical school of Washington University; that he has specialized in obstetrics and gynecology for 35 years and has taught these subjects in Washington University; that if a pregnant woman starts having a little flow or discharge of blood, an ordinarily careful physician in that community would prescribe rest and sedation; that, in his opinion, nothing else would do any good; that a number of things had been tried and discovered; that Dr. Willard Allen of Washington University had developed progesterol but that it is not now the usual and customary practice to use the substance in threatened miscarriage; that "everybody found it is worthless, this usually has been given up;" that the rest and sedatives can be followed at home just as well as in the hospital; that if a woman has a discharge less than a menstrual flow, the ordinary and customary

thing to do is to tell her to get more rest and to take something to get more sleep at night; that nothing else would do any good; that the way to determine if a woman is going to give birth to a baby is to make inquiry as to whether she is having pains; that if the pains are the contraction of the uterus and are intermittent, that is, they come and go, the woman is going to give birth; and that when a woman is actually in labor, it is evident to everyone, she cannot hide it. He also testified that if a woman does not have intermittent pains, she is not going to give birth; that if a husband had told him on the telephone that his wife did not have intermittent pains, that he would say she was not in labor and that there was nothing to worry about, and would leave her at home.

Other essential facts will be stated in the course of this opinion.

Appellants state that this is "not a 'malpractice case,' in the strict sense," but that respondent neglected and abandoned Mrs. Small between January 11th and the morning of January 14th, therefore, he was negligent as a matter of law.

Appellants' Instruction No. 1 told the jury that the relationship of physician and patient existed between appellant Mrs. Small and respondent and that he was under the obligation to her to exercise the "average degree of skill, care and diligence exercised by members of the medical profession residing in the vicinity of St. Louis * * * and any unexcused failure of the defendant (respondent) to exercise such skill, care and diligence constitutes negligence."

Appellants' Instruction No. 2 told the jury that if respondent "failed to attend and treat plaintiff, Lillian Small, during the period from January 11th, 1950 to January 13th, 1950, or, if you find that defendant failed to take steps to inform himself of plaintiff Lillian Small's condition during the period from January 11th, 1950, and through January 13th, 1950, or if you find that defendant failed to attend and treat plaintiff, Lillian Small, at her home on the night of January 13th and early morning of January 14th, 1950, and if you further find that such failure, if any, constituted negligence within the meaning of Instruction No. 1," then the jury's verdict should be in favor of appellants.

These instructions and appellants' hypothetical question asked their expert witness, Dr. William Nelson, clearly show that appellants' theory on which they tried this case in the trial court, that of the issue of respondent's having abandoned his patient, Mrs. Small, was a jury question. Furthermore, appellants did not request a directed verdict.

■ Appellants are bound by the theory upon which the cause was presented and lost in the trial court. Spiking School District No. 71 v. Purported Enlarged School District, 362 Mo. 848, 245 S.W.2d 13.

After the case was submitted to the jury, the jury requested that the trial court have the testimony concerning "a phone call on the evening of the 13th" reviewed, which request was denied.

■ The record shows that all parties and attorneys were present when this request was made but the record does not show that either of the parties consented or objected to the request. It is the position of appellants that since neither side objected, the trial court should have granted the request and required the reporter to read his notes in regard to the telephone calls.

In the case of Padgitt v. Moll, 159 Mo. 143, loc. cit. 155–156, 60 S.W. 121, 124, 52 L.R.A. 854, 81 Am.St.Rep. 347, this court held that the reporter's notes should be read after the case was submitted to the jury only on the condition that counsel on both sides consented thereto. In ruling that case, we said:

"But the law guards with a somewhat jealous care the province of the jury, even from encroachment by the judge.

The duty to hear and weigh the evidence and pronounce upon its preponderance, the duty to find the facts from the evidence as it falls from the lips of the witnesses at the trial, is the peculiar office of the jury. The juror has a right, and it is his duty to base his verdict on the evidence as he heard it; and he is not required and should not be compelled to yield his own memory and his own understanding of the evidence to that of another, even though that other professed to have taken notes. A juror's memory of the evidence at that stage of the case is as trustworthy as the stenographer's notes. * * *. If the memory of the juror is liable to be in error, or if, in the confusion of the trial, he may not have heard correctly what the witnesses said, he is in that respect no more liable to error or misunderstanding than any one else engaged in the trial, and at that stage of the case, at least, the law has made it his particular province to decide what the evidence was, just as at a later stage it is the judge's duty to settle a disputed question of that kind. But while the jury is in the act of exercising its particular and exclusive office its province should not be invaded."

We think the reasons assigned in not permitting a reporter's notes to be read to the jury are sound and that case should be followed. That case holds that the notes can be read only when both parties consent. It necessarily excludes the right to read the notes when neither party objects to having the notes read. See also the case of Isreal v. Fanchon & Marco, Mo.App., 58 S.W.2d 774.

■ Appellants contend that the trial court erred in giving Instruction No. 6 because it was misleading and confusing. That instruction is as follows: "The court instructs you that you may not base a verdict against defendant Dr. Wegner entirely and exclusively on mere surmise, guesswork and speculation and if, therefore, upon the whole evidence in this case fairly considered, you are not able to make a finding that the defendant Dr. Wegner is liable without resorting to surmise, guesswork and speculation outside of and beyond the scope of the evidence and the reasonable inferences deductible therefrom, then you will return a verdict for the defendant Dr. Wegner."

In the case of West v. St. Louis Public Service Co., 361 Mo. 740, 236 S.W.2d 308, loc. cit. 312, we approved the identical instruction. In ruling the case, we said:

"When the instruction is so considered, it has this meaning: Negligence is not a presumption of law but it must be proved as explained in other instructions. If, upon all the evidence in the case, including reasonable inferences to be drawn therefrom, the jury is unable to make a finding that defendant is liable, they are not permitted to go *outside* of and beyond the scope of the evidence and reasonable inferences drawn therefrom, and base a verdict for plaintiff entirely and exclusively upon mere surmise, guesswork and speculation. If this is the meaning of the instruction (and we think it is), it is a correct statement of the law, in abstract form, and it is not in conflict with the principles stated by this Court in Harke v. Haase, supra [335 Mo. 1104, 75 S.W.2d 1001]."

However, in the case of Price v. Schnitker, 361 Mo. 1179, 239 S.W.2d 296, loc. cit. 300, we stated that upon retrial this instruction should not be given because of the number of cautionary and burden of proof instructions that had already been given in that case. In ruling that case, we said "Upon retrial, Instruction F should not be given, although we do not hold that the giving thereof upon the trial now under review constituted reversible error."

We hold this instruction is not misleading or confusing, as contended by appellants.

■ Appellants contend that the verdict of the jury is not sustained by material, probative and substantial evidence. For the purpose of this opinion only, we will assume appellants' contentions

are true. "The sufficiency of the evidence to support the verdict in defendant's favor is not an open question in this court; therefore we need not concern ourselves about what the evidence showed in that regard. The burden was not on the defendant, but was on the plaintiff to make out the case stated in his petition. In a case where the allegations of the petition are denied by the answer, and the plaintiff offers oral evidence tending to support the allegations of the petition, the defendant is entitled to have the jury pass upon the credibility of such evidence even though he should offer no evidence himself. The court has no right to tell the jury that it must believe the witnesses. The jury, in the first instance, is the sole judge of the credibility of the witnesses and of the weight and value of their evidence, and may believe or disbelieve the testimony of any one or all of the witnesses, though such evidence be uncontradicted and unimpeached." Cluck v. Abe, 328 Mo. 81, 40 S.W.2d 558, loc. cit. 559.

In the case at bar, there was a defendant's (respondent's) verdict. Respondent's answer denied any negligence. The burden was on appellants to prove their case. Evidently the jury did not believe appellants or their witnesses. This they had a right to do, even if respondent offered no evidence.

From what we have said, it follows that the judgment of the trial court should be affirmed. It is so ordered.

ELLISON, J., concurs.

LEEDY, J., concurs in separate opinion filed.

LEEDY, Judge (concurring).

I concur in the principal opinion but desire to amplify my views respecting the challenged instruction, No. 6. We have characterized an instruction in the language of No. 6 as being in effect an elaboration upon a burden of proof instruction. Price v. Schnitker, 361 Mo. 1179, 239 S.W.2d 296, 300. I do not say that the giving of instruction No. 6 constituted reversible error, but I am of the view that a properly worded, short, simple instruction on burden of proof is much to be desired over the prevailing practice of giving so-called counter burden of proof instructions, and others of the type of No. 6. Such was the view of this division of the court in directing that the counterpart of No. 6 be not given on retrial of Price v. Schnitker.